**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

BVS, INC.,

        Plaintiff,

vs.

CDW DIRECT, LLC,

        Defendant and Third-Party
        Plaintiff,

vs.

ARROW ELECTRONICS, INC.,
TSSLINK, INC. and NET APP, INC.,

        Third-Party Defendants.

_____

NET APP, INC.,

        Counter Claimant,

vs.

CDW DIRECT, LLC,

        Counter Defendant.

**ORDER**

11-CV-79-LRR

*TABLE OF CONTENTS*

I.     **INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.    **PROCEDURAL HISTORY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

      A.    *Arrow Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      B.    *CDW Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      C.    *Net App Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      D.    *TSSLink Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

III.   **SUBJECT MATTER JURISDICTION.** . . . . . . . . . . . . . . . . . . . . . . **5**

IV.   **SUMMARY JUDGMENT STANDARD.** . . . . . . . . . . . . . . . . . . . . . **5**

**V.      RELEVANT FACTUAL BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . **6**

    *A.      Parties*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

    *B.      Course of Dealing Between BVS and CDW*. . . . . . . . . . . . . . . . . **7**

    *C.      SAN Project Design*. . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

    *D.      Contract Formation*. . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

    *E.      Installation and Implementation*. . . . . . . . . . . . . . . . . . . . . **13**

**VI.     CDW MOTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

    *A.      Breach of Contract Claim*. . . . . . . . . . . . . . . . . . . . . . . . **15**

        *1.      What are the terms of the contract?*. . . . . . . . . . . . . . . . **16**

            *a.      Are the Terms and Conditions part of the contract?*. . . **16**

                *i.      Parties' arguments*. . . . . . . . . . . . . . . . . **16**

                *ii.     Applicable law*. . . . . . . . . . . . . . . . . . . **17**

                *iii.    Application*. . . . . . . . . . . . . . . . . . . . . **20**

            *b.      Are oral promises part of the contract?*. . . . . . . . . . **22**

                *i.      Parties' arguments*. . . . . . . . . . . . . . . . . **22**

                *ii.     Applicable law*. . . . . . . . . . . . . . . . . . . **22**

                *iii.    Application*. . . . . . . . . . . . . . . . . . . . . **24**

        *2.      Did CDW breach the contract?*. . . . . . . . . . . . . . . . . . **26**

    *B.      Unjust Enrichment Claim*. . . . . . . . . . . . . . . . . . . . . . . . . **27**

    *C.      Breach of Warranty Claims*. . . . . . . . . . . . . . . . . . . . . . . . **29**

        *1.      Parties' arguments*. . . . . . . . . . . . . . . . . . . . . . . . **29**

        *2.      Application*. . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

    *D.      Fraud and Fraudulent Nondisclosure Claims*. . . . . . . . . . . . . . . **32**

        *1.      Parties' arguments*. . . . . . . . . . . . . . . . . . . . . . . . **32**

        *2.      Applicable law*. . . . . . . . . . . . . . . . . . . . . . . . . . **32**

            *a.      Effect of integration clause*. . . . . . . . . . . . . . . **32**

            *b.      Fraud pleading requirements*. . . . . . . . . . . . . . . **33**

        *3.      Fraud claim*. . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

            *a.      Timing of installation and implementation*. . . . . . . . **35**

            *b.      CDW's technical competency*. . . . . . . . . . . . . . . **36**

            *c.      Replication*. . . . . . . . . . . . . . . . . . . . . . . . **37**

            *d.      World-class solution*. . . . . . . . . . . . . . . . . . . **37**

        *4.      Fraudulent nondisclosure claim*. . . . . . . . . . . . . . . . . . **39**

            *a.      Applicable law*. . . . . . . . . . . . . . . . . . . . . . **39**

            *b.      Application*. . . . . . . . . . . . . . . . . . . . . . . . **40**

                *i.      No-return policy*. . . . . . . . . . . . . . . . . . **40**

                *ii.     Lack of technical aptitude*. . . . . . . . . . . . . **41**

**VII.   REMAINING MOTIONS FOR SUMMARY JUDGMENT.** . . . . . . . . . . . **41**

**VIII.  CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

# I.   INTRODUCTION

The matters before the court are Defendant CDW Direct, LLC's ("CDW") "Motion for Summary Judgment" ("CDW Motion") (docket no. 70), Third-Party Defendant Arrow Electronics, Inc.'s ("Arrow") "Motion for Summary Judgment" ("Arrow Motion") (docket no. 66), Third-Party Defendant Net App, Inc.'s. ("Net App") "Motion for Summary Judgment" ("Net App Motion") (docket no. 67) and Third-Party Defendant TSSLink, Inc.'s ("TSSLink") "Motion for Summary Judgment" ("TSSLink Motion") (docket no. 68).

# II.   PROCEDURAL HISTORY

On July 19, 2011, BVS, Inc. ("BVS") filed a Complaint (docket no. 2) against CDW, Arrow and TSSLink, alleging breach of contract and unjust enrichment. On February 13, 2012, BVS moved the court to dismiss the claims against Arrow and TSSLink. *See* Motion to Dismiss (docket no. 27) at 2. On March 2, 2012, the court dismissed Arrow and TSSLink from the instant action without prejudice. *See* March 2, 2012 Order (docket no. 31) at 1.

On April 16, 2012, BVS filed an Amended Complaint (docket no. 38) against CDW. In the Amended Complaint, BVS alleges breach of contract (Count I), unjust enrichment (Count II), breach of express warranty (Count III), breach of implied warranty of merchantability (Count IV), breach of implied warranty of fitness for a particular purpose (Count V), fraud (Count VI) and fraudulent nondisclosure (Count VII)[1] against CDW.

---

[1] The Amended Complaint erroneously marks the fraudulent nondisclosure claim as a second Count VI. Thus, the court will refer to the fraudulent nondisclosure claim as Count VII.

On April 17, 2012, CDW filed a Third-Party Complaint (docket no. 41) against Net App, Arrow and TSSLink. In the Third-Party Complaint, CDW alleges that Net App, Arrow and TSSLink are liable to CDW for contribution and indemnity if CDW is found liable to BVS (Count I), Net App is liable for contractual indemnity if CDW is found liable to BVS (Count II), Arrow is liable for contractual indemnity if CDW is found liable to BVS (Count III), Arrow breached its contract with CDW (Count IV) and TSSLink breached its contract with Arrow, which CDW can enforce as a third-party beneficiary of the contract (Count V).

On May 9, 2012, CDW filed an Answer (docket no. 45) to the Amended Complaint, denying BVS's claims and asserting affirmative defenses. On June 25, 2012, Arrow filed an Answer (docket no. 50) to the Third-Party Complaint, denying CDW's claims. On that same date, Net App filed an Answer (docket no. 49) to the Third-Party Complaint, denying CDW's claims, asserting affirmative defenses and asserting a counterclaim against CDW for attorneys' fees and expenses. Also on that same date, TSSLink filed an Answer (docket no. 48) to the Third-Party Complaint, denying CDW's claims and asserting affirmative defenses.

### A. Arrow Motion

On December 13, 2012, Arrow filed the Arrow Motion. On January 7, 2013, CDW filed a Resistance (docket no. 77) to the Arrow Motion. On January 14, 2013, Arrow filed a Reply (docket no. 89) to CDW's Resistance to the Arrow Motion. The Arrow Motion is fully submitted and ready for decision.

### B. CDW Motion

On December 14, 2012, CDW filed the CDW Motion. On January 8, 2013, BVS filed a Resistance (docket no. 84) to the CDW Motion. On January 17, 2013, CDW filed a Response (docket no. 92) to BVS's Statement of Additional Material Facts (docket no. 84-1). On January 18, 2013, CDW filed a Reply (docket no. 94) to BVS's Resistance to

the CDW Motion.  In the CDW Motion, CDW requests the opportunity to present oral argument.  The court finds that oral argument is unnecessary.  The CDW Motion is fully submitted and ready for decision.

### C.  Net App Motion

On December 14, 2012, Net App filed the Net App Motion.  On January 7, 2013, BVS filed a Response (docket no. 75) to Net App's Statement of Undisputed Material Facts (docket no. 67-2).  On that same date, CDW filed a Resistance (docket no. 76) to the Net App Motion.  On January 14, 2013, Net App filed a Reply (docket no. 87) to CDW's Resistance to the Net App Motion.  The Net App Motion is fully submitted and ready for decision.

### D.  TSSLink Motion

On December 14, 2012, TSSLink filed the TSSLink Motion.  On January 7, 2013, CDW filed a Resistance (docket no. 78) to the TSSLink Motion.  On January 14, 2013, TSSLink filed a Reply (docket no. 90) to CDW's Resistance to the TSSLink Motion.  In the TSSLink Motion, TSSLink requests the opportunity to present oral argument.  The court finds that oral argument is unnecessary.  The TSSLink Motion is fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

The court has diversity jurisdiction over this case because complete diversity exists between the parties and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is . . . between citizens of different States . . . .").

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012). "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving parties and affording them all reasonable inferences, the uncontested material facts are as follows.

### A. Parties

BVS is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. BVS provides on-line training to banks and credit unions. BVS provides its training services over the internet through the BVS computer system. BVS's main computer system is located in Cedar Rapids, Iowa. BVS also has a disaster recovery system in Omaha, Nebraska. Roy Karon owns BVS. At times material to the instant action, Gary Praegitzer was the BVS information technology ("IT") manager and Sean Reinhard worked in the BVS IT department.

CDW is an Illinois limited liability company with its principal place of business in

Vernon Hills, Illinois. CDW is a reseller of technology products and services. CDW sells products and services nationally through an internet-based retail business. CDW does not manufacture technology products. At times material to the instant action, Amer Harb was an account manager for CDW and was assigned to the BVS account. Samantha Aljets was a project coordinator for CDW.

Net App is a Delaware corporation with its principal place of business in Sunnyvale, California. Net App manufactures and sells technology products and services nationally. At times material to the instant action, Ben Knorr was a sales engineer with Net App and Michelle Schmidt was a customer service representative.

Arrow is a New York corporation with its principal place of business in Melville, New York. Arrow sells components, services and solutions to resellers. Arrow is authorized to sell and provide services related to Net App technology products. At times material to the instant action, Cynthia Clark was a project manager with Arrow.

TSSLink is a California corporation with its headquarters in Sunnyvale, California. TSSLink provides software implementation services and hardware services. TSSLink is authorized to provide services related to Net App technology products. At times material to the instant action, Matt Romo was a professional services engineer responsible for performing software-based implementations of Net App software as well as hardware-based installations of Net App hardware.

### B. Course of Dealing Between BVS and CDW

Prior to the transaction at issue in the instant case, BVS had ordered products and services from CDW on numerous occasions. BVS had an account with CDW to make online purchases since at least 2006. BVS authorized Reinhard and Praegitzer to purchase items for BVS. Reinhard and Praegitzer purchased items on behalf of BVS from CDW in three different ways: (1) by placing online orders; (2) by requesting a quote from Harb for a discounted price on an item and then purchasing the item at that price online; and (3)

7

by requesting a quote from Harb and then notifying Harb via telephone or email that BVS would like to purchase the item at the quoted price, at which point a CDW employee would access the BVS account and place the order. After BVS placed an order on the CDW ordering system, the system sent a confirmation to BVS.

Every order confirmation, shipping confirmation, invoice and CDW packing list referred to the CDW Terms and Policies or Terms and Conditions. Between 2007 and 2010, BVS received 269 order confirmations, 363 shipping confirmations and 363 invoices from CDW. Every invoice had the Terms and Conditions printed on the back. In addition, every time BVS went to the CDW web site to place an order, BVS could have seen a link to the Terms and Conditions that is included at the bottom of every CDW web page. The online Terms and Conditions contain all of the Terms and Conditions listed on the back of the invoice, as well as additional terms.

## C.  SAN Project Design

In late 2010, BVS was looking to update several components of its computer system, including its storage area network ("SAN"). BVS was unhappy with its existing SAN from manufacturer ECM due to the poor customer service that BVS thought ECM provided. BVS began looking for a new SAN solution that would store electronic data from BVS's Cedar Rapids location and regularly copy the data to BVS's disaster recovery site in Omaha.

At the time, Harb was the CDW account manager responsible for the BVS account. BVS contacted CDW in the fall of 2010 to discuss options for a SAN solution. After discussing options with Praegitzer, Harb set up a conference call with Knorr and Schmidt of Net App to begin developing the SAN solution. Knorr and Schmidt also traveled to Cedar Rapids to meet with BVS employees. Knorr was responsible for managing the Net App hardware and software for the SAN solution, although he was not responsible for managing the installation and implementation services. Arrow was responsible for

providing installation and implementation services. CDW did not rely on its own solution architects but instead relied on Net App and Arrow to architect and implement BVS's SAN solution.

## D. Contract Formation

On December 3, 2010, CDW sent BVS a quote for hardware, software and services for the SAN solution. On December 20, 2010, BVS sent CDW a purchase order for the SAN solution, which incorporated the December 3, 2010 quote. The December 20, 2010 purchase order included hardware, software, training and support services, including six "Arrow Provisioned Services." Purchase Order, CDW's Appendix ("CDW App'x") (docket nos. 70-2 through 70-8) at 209. The December 20, 2010 purchase order listed a total purchase price of $225,000.33. Once CDW received the December 20, 2010 purchase order, Harb submitted the purchase order for credit approval. On December 21, 2010, CDW sent a purchase order to Arrow to fulfill the December 20, 2010 BVS purchase order. On January 3, 2011, CDW sent BVS an invoice for the same hardware, software and services listed in the December 3, 2010 quote and December 20, 2010 purchase order.[2] The invoice listed a price of $225,000.24 for the Net App goods and services and the Arrow provisioned services, plus an additional $733.67 in shipping costs, amounting to a total purchase price of $225,733.91. Invoice, CDW App'x at 233-34.

On the back of the invoice, CDW listed several terms and conditions that were not included in the December 3, 2010 quote or December 20, 2010 purchase order. Specifically, the Terms and Conditions included the following:

> THE TERMS AND CONDITIONS ARE LIMITED TO THOSE CONTAINED HEREIN AND THE ADDITIONAL TERMS AND CONDITIONS CONTAINED IN THE

---

[2] The December 3, 2010 quote, December 20, 2010 purchase order and January 3, 2011 invoice did not include terms regarding project management by CDW or a project completion date.

9

"TERMS AND CONDITIONS" LINK AT WWW.CDW.COM INCORPORATED HEREIN BY REFERENCE. ANY TERMS NOT DEFINED HEREIN ARE DEFINED AT WWW.CDW.COM. . . .

. . . .

Warranties

Customer understands that Seller is not the manufacturer of the Products purchased by Customer hereunder and the only warranties offered are those of the manufacturer, not Seller or its Affiliates. In purchasing the Products, Customer is relying on the manufacturer's specifications only and is not relying on any statements, specifications, photographs or other illustrations representing the Products that may be provided by Seller or its Affiliates. SELLER AND ITS AFFILIATES HEREBY EXPRESSLY DISCLAIM ALL WARRANTIES EITHER EXPRESS OR IMPLIED, RELATED TO PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF TITLE, ACCURACY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTY OF NONINFRINGEMENT, OR ANY WARRANTY RELATING TO THIRD PARTY SERVICES. THE DISCLAIMER CONTAINED IN THIS PARAGRAPH DOES NOT AFFECT THE TERMS OF ANY MANUFACTURER'S WARRANTY. Customer expressly waives any claim that it may have against Seller or its Affiliates based on any product liability or infringement or alleged infringement of any patent, copyright, trade secret or other intellectual property rights (each a "Claim") with respect to any Product and also waives any right to indemnification from Seller or its Affiliates against any such Claim made against Customer by a third party. Customer acknowledges that no employee of Seller or its Affiliates is authorized to make any representation or warranty on behalf of Seller or any of its Affiliates that is not in this Agreement.

Seller warrants that the Services will be performed in a good and workmanlike manner. Customer's sole and exclusive

remedy and Seller's entire liability with respect to this warranty will be, at the sole option of Seller, to either (a) use its reasonable commercial efforts to reperform or cause to be reperformed any Services not in substantial compliance with this warranty or (b) refund amounts paid by Customer related to the portion of the Services not in substantial compliance; provided, in each case, Customer notifies Seller in writing within five (5) business days after performance of the applicable Services. EXCEPT AS SET FORTH HEREIN OR IN ANY STATEMENT OF WORK THAT EXPRESSLY AMENDS SELLER'S WARRANTY, AND SUBJECT TO APPLICABLE LAW, SELLER MAKES NO OTHER, AND EXPRESSLY DISCLAIMS ALL OTHER, REPRESENTATIONS, WARRANTIES, CONDITIONS OR COVENANTS, EITHER EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, DURABILITY, TITLE, ACCURACY OR NON-INFRINGEMENT) ARISING OUT OF OR RELATED TO THE PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY WARRANTY RELATING TO THIRD PARTY SERVICES, ANY WARRANTY WITH RESPECT TO THE PERFORMANCE OF ANY HARDWARE OR SOFTWARE USED IN PERFORMING SERVICES AND ANY WARRANTY CONCERNING THE RESULTS TO BE OBTAINED FROM THE SERVICES. THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY AND LIMITED REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE. CUSTOMER ACKNOWLEDGES THAT NO REPRESENTATIVE OF SELLER OR OF ITS AFFILIATES IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES THAT IS NOT IN THIS AGREEMENT OR IN A STATEMENT OF WORK EXPRESSLY AMENDING SELLER'S WARRANTY.

. . . .

Limitation of Liability

UNDER NO CIRCUMSTANCES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY SET FORTH HEREIN, WILL SELLER, ITS AFFILIATES OR ITS OR THEIR SUPPLIERS, SUBCONTRACTORS OR AGENTS BE LIABLE FOR: (A) ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, BUSINESS, REVENUES OR SAVINGS, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITIES OF SUCH DAMAGES OR IF SUCH DAMAGES ARE OTHERWISE FORESEEABLE, IN EACH CASE, WHETHER A CLAIM FOR ANY SUCH LIABILITY IS PREMISED UPON BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY OF LIABILITY; (B) ANY CLAIMS, DEMANDS OR ACTIONS AGAINST CUSTOMER BY ANY THIRD PARTY; (C) ANY LOSS OR CLAIM ARISING OUT OF OR IN CONNECTION WITH CUSTOMER'S IMPLEMENTATION OF ANY CONCLUSIONS OR RECOMMENDATIONS BY SELLER OR ITS AFFILIATES BASED ON, RESULTING FROM, ARISING OUT OF OR OTHERWISE RELATED TO THE PRODUCTS OR SERVICES; OR (D) ANY UNAVAILABILITY OF THE PRODUCT FOR USE OR ANY LOST, DAMAGED OR CORRUPTED DATA OR SOFTWARE. IN THE EVENT OF ANY LIABILITY INCURRED BY SELLER OR ANY OF ITS AFFILIATES, THE ENTIRE LIABILITY OF SELLER AND ITS AFFILIATES FOR DAMAGES FROM ANY CAUSE WHATSOEVER WILL NOT EXCEED THE LESSER OF: (A) THE DOLLAR AMOUNT PAID BY CUSTOMER FOR THE PRODUCT(S) GIVING RISE TO THE CLAIM OR THE SPECIFIC SERVICES GIVING RISE TO THE CLAIM; OR (B) $50,000.

Terms and Conditions, CDW App'x at 110.[3] The CDW website contains additional terms and conditions regarding warranties and limitation of liability. The website Terms and Conditions state:

> BY ACCEPTING DELIVERY OF THE PRODUCTS OR BY ENGAGING THE CDW AFFILIATE IDENTIFIED ON THE INVOICE, STATEMENT OF WORK OR OTHER CDW DOCUMENTATION ("SELLER") TO PROVIDE PRODUCT OR PERFORM OR PROCURE ANY SERVICES, CUSTOMER AGREES TO BE BOUND BY AND ACCEPTS THESE TERMS AND CONDITIONS . . . .
>
> Customer accepts these Terms and Conditions by making a purchase from or placing an order with Seller or shopping on Seller's Website (the "Site") or otherwise requesting products (the "Products") or engaging Seller to perform or procure any Services . . . .

Terms and Conditions of Sales and Service Projects, CDW App'x at 111. Previous order confirmations from CDW to BVS referred to the Terms and Conditions on the CDW website, and the CDW website references the Terms and Conditions at the bottom of every page.

On January 12, 2011, BVS sent CDW a check for $225,733.91, the price listed in the invoice. The check referenced the January 3, 2011 invoice.

### E. Installation and Implementation

BVS received the Net App goods listed in the invoice. Arrow hired TSSLink to perform the Arrow provisioned services listed on the invoice, which included installation and implementation of the SAN system. On February 7, 2011, a kickoff phone call was held to discuss the work involved on the project, introduce the engineer and discuss

---

[3] The Terms and Conditions are also listed on the back of the January 3, 2011 invoice at CDW App'x at 235. However, the copy provided at CDW App'x at 110 is a clearer copy.

scheduling of the services. Aljets and Harb from CDW, Praegitzer from BVS, Romo from TSSLink and Clark from Arrow participated in the kickoff phone call.

Arrow first proposed installing and implementing the system from January 27, 2011, to January 28, 2011. BVS declined to have the installation done during the proposed dates, and the installation was rescheduled for March 1, 2011, to March 3, 2011. Arrow also requested that Praegitzer fill out a configuration worksheet, which various Arrow and CDW employees sent to Praegitzer at various times between January 27, 2011, and February 23, 2011. Praegitzer completed the worksheet on February 25, 2011, although he testified that he provided much of the information verbally and was waiting for access to a database to acquire the remaining information.

Romo provided the Arrow provisioned services from March 1, 2011, through March 3, 2011. On March 3, 2011, Romo filled out a project completion form, which Praegitzer signed. The project completion form states that four services were complete and a fifth service, the Snap Manager SQL migration service, was not complete. Romo also performed the sixth Arrow provisioned service that was erroneously left off of his project order documentation. Between March 3, 2011, and May 2011, Romo made several attempts to complete the installation and implementation of the SAN system, including several conference calls and web-based troubleshooting sessions.

On April 14, 2011, Praegitzer sent an email to Aljets at CDW, expressing his frustration that the SAN system was not fully implemented and functioning properly. In response, Knorr from Net App offered to send a Net App engineer to Cedar Rapids to get the system working. BVS declined Knorr's offer and, on May 19, 2011, BVS decided that the system would not be able to function properly and attempted to send the hardware and software back to CDW. However, CDW refused to take the system back.

## VI.  CDW MOTION

The court will consider each of BVS's claims in the Amended Complaint and

determine whether summary judgment in favor of CDW is appropriate as to each claim.

## A. Breach of Contract Claim

As an initial matter, the court shall apply Iowa law to the instant action.[4] The parties agree that BVS entered into a contract with CDW for the sale of goods and services. The parties further agree that the contract was formed before CDW sent BVS the invoice with the Terms and Conditions printed on the back. Thus, the parties agree that the contract includes, at least, the December 20, 2010 purchase order. The court agrees and finds that the purchase order represents BVS's offer. Accepting the parties' contention that the contract was formed before CDW sent BVS the invoice as true, the court further finds that CDW accepted BVS's offer when it sent a purchase order to Arrow to fulfill BVS's purchase order.

To establish a breach of contract claim, BVS must establish:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered some damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). In this case, the parties agree that a contract exists but disagree as to the terms of the contract and whether CDW failed to perform as required by the contract. Thus, the court

----

[4] The court notes that the Terms and Conditions contain a choice-of-law provision, which states that "these terms and conditions, . . . the services hereunder and any sale of products hereunder will be governed by the laws of the State of Illinois, without regard to conflicts of laws rules." Terms and Conditions, CDW App'x at 110 (emphasis omitted). However, in their briefs, both parties apply Iowa law. Therefore, because BVS and CDW agree that the court should apply Iowa law in its analysis of the CDW Motion, the court will apply Iowa law for the purposes of determining the existence of and interpreting the contract between BVS and CDW. The court further notes that Iowa and Illinois have both adopted the Uniform Commercial Code. *See* Iowa Code Chapter 554; Illinois Code Chapter 810. Thus, relevant principles of contract law are the same in both jurisdictions.

will first address what the terms of the contract are and then turn to consider whether CDW failed to perform any of the promises in the contract.

### 1. *What are the terms of the contract?*

As noted above, the parties agree that the contract includes, at least, the December 20, 2010 purchase order. However, the parties disagree as to whether the Terms and Conditions printed on the back of the January 3, 2011 invoice apply and whether the contract includes any oral promises that CDW may have made. The court notes that the December 3, 2010 quote, December 20, 2010 purchase order and January 3, 2011 invoice provide the same list of items for CDW to deliver to BVS. However, the January 3, 2011 invoice also includes the Terms and Conditions printed on the back.

### a. *Are the Terms and Conditions part of the contract?*

### i. *Parties' arguments*

CDW argues that the Terms and Conditions are part of the contract because: (1) "they were part of the invoice price BVS paid in full"; and (2) "the parties had a course of dealing that includes the Terms and Conditions." Brief in Support of CDW Motion (docket no. 72-1) at 23. In addition, CDW argues that the Terms and Conditions do not "materially alter" the contract under Iowa Code section 554.2207(2)(b) and, therefore, the Terms and Conditions are part of the contract.

In its Resistance to the CDW Motion, BVS argues that the Terms and Conditions do not apply because CDW sent the Terms and Conditions after the parties had already entered into the contract and, therefore, BVS did not accept them. In addition, BVS argues that, "because the parties already had an agreement" when CDW sent the invoice containing the Terms and Conditions, the Terms and Conditions are "proposals for addition to the contract." Resistance to CDW Motion at 18 (citing Iowa Code § 554.2207(2)). According to BVS, these proposals materially alter the parties' previous contract under Iowa Code section 554.2207(2)(b) and, therefore, the Terms and Conditions are not part of the contract.

## ii. Applicable law

The Iowa Supreme Court has held that, "[e]xcept when there is ambiguity, the question of whether a written instrument . . . binds the parties in contract is a question of law." *French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993). "Under Iowa law, the cardinal rule of contract construction is that the intent of the parties controls." *DeJong v. Sioux Ctr., Iowa*, 168 F.3d 1115, 1119 (8th Cir. 1999).

A court can consider evidence of prior course of dealings when interpreting a contract, even if the contract is complete and unambiguous. *See* Iowa Code § 554.2202. Iowa Code section 554.2202 provides, in relevant part:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement, but may be explained or supplemented . . . by . . . course of dealing.

Iowa Code § 554.2202. Official comment 1 to Iowa Code section 554.2202 states that this section "definitely rejects . . . [t]he requirement that a condition precedent to the admissibility of [course of dealing evidence] is an original determination by the court that the language used is ambiguous." Iowa Code § 554.2202, cmt. 1; *accord C-Thru Container Corp. v. Midland Mfg. Co.*, 533 N.W.2d 542, 545 (Iowa 1995) (holding that, even though a contract stated that it "constitutes the entire agreement between [the parties] and supersedes any and all prior agreements between them," it may nonetheless be "explained or supplemented by parol evidence" pursuant to U.C.C. section 2-202). In addition, official comment 2 to Iowa Code section 554.2202 provides that "evidence of course of dealing" is admissible to

> supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the

17

> parties . . . w[as] taken for granted when the document was
> phrased. Unless carefully negated they have become an
> element of the meaning of the words used.

Iowa Code § 554.2202, cmt. 2. "Course of dealing" is defined as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Iowa Code § 554.1303(2).

Iowa Code section 554.2207 provides:

> 1. A definite and seasonable expression of acceptance or a
> written confirmation which is sent within a reasonable time
> operates as an acceptance even though it states terms additional
> to or different from those offered or agreed upon, unless
> acceptance is expressly made conditional on assent to the
> additional or different terms.
>
> 2. The additional terms are to be construed as proposals for
> addition to the contract. Between merchants such terms
> become part of the contract unless:
> . . .
>
> b. they materially alter it.

Iowa Code § 554.2207. Whether an additional term "materially alter[s]" the terms of the parties' contract depends on whether the term "result[s] in surprise or hardship if incorporated without express awareness by the other party." Iowa Code § 554.2207, cmt. 4; *see also All-Iowa Contracting Co. v. Linear Dynamics, Inc.*, 296 F. Supp. 2d 969, 979 (N.D. Iowa 2003) (holding that an additional term did not materially alter the contract because the plaintiff "cannot profess to be surprised" by an additional term in an invoice when the price quotation contained the identical term).

In *Sudenga Industries, Inc. v. Fulton Performance Products, Inc.*, 894 F. Supp. 1235 (N.D. Iowa 1995), the court addressed a contract dispute after the defendant sold allegedly defective goods to the plaintiff. After the plaintiff placed an order with the

defendant, the defendant shipped the goods and subsequently sent an invoice. *Id.* at 1236. The court held that the terms on the back of the defendant's invoice, which the defendant sent after the parties reached an agreement and qualified as a "written confirmation," were enforceable because the "invoices were issued relatively contemporaneously with the shipment of goods, . . . the parties' dealings involved identical invoice provisions throughout the parties' relationship, . . . additional terms [we]re found in the invoices that [we]re not in the purchase orders, and [the plaintiff] never exercised any opportunity to delete these additional terms." *Id.* at 1238. The court further noted that "courts have quite consistently found that invoices sent contemporaneously with goods can qualify as written confirmations under [U.C.C. section] 2-207." *Id.* at 1238 n.3.

In *All-Iowa Contracting Co.*, this court addressed a contract dispute after the plaintiff ordered a product from the defendant. *All-Iowa Contracting Co.*, 296 F. Supp. 2d at 973. Five days after the plaintiff placed the order, the plaintiff picked up the product from the defendant's warehouse and signed a customer order. *Id.* Later, the defendant sent an invoice to the plaintiff with terms and conditions on the back. *Id.* When a dispute arose between the parties, this court was asked to determine whether the terms and conditions on the back of the invoice that the defendant sent after the parties had reached an agreement, including a warranty disclaimer, were part of the contract. This court held that, even though warranty disclaimers normally "materially alter" a contract under U.C.C. section 2-207,[5] the plaintiff "failed to create a genuine issue of material fact with regard to whether it was actually 'surprised' by the warranty disclaimer," *id.* at 979, because, prior to placing its order with the defendant, the plaintiff received a price quotation from the defendant that stated that it is subject to the defendant's terms and conditions, *id.* 973 n.5. Thus, the court held that, under the circumstances, the warranty disclaimer was enforceable because it did not materially alter the terms of the parties'

---

[5] Iowa Code section 554.2207 is nearly identical to U.C.C. section 2-207.

contract under U.C.C. section 2-207(2)(b). *Id.* at 979.

The court also finds the United States District Court for the District of Colorado's analysis in *Avedon Engineering, Inc. v. Seatex*, 112 F. Supp. 2d 1090 (D. Colo. 2000) to be persuasive. The District Court for the District of Colorado applied Colorado Revised Statute section 4-2-207, which is nearly identical to Iowa Code section 554.2207, to determine whether an arbitration clause, an additional term included in a written confirmation, was part of the parties' contract. In evaluating whether the arbitration clause materially altered the contract, the court stated that "[a] prior course of dealing and the number of written confirmations exchanged between the parties is important to evaluate." *Id.* at 1094 (stating that "[s]urprise has both an objective and subjective element" and occurs "'when a term is included without the express awareness of the other party'" (quoting *Am. Ins. Co. v. El Paso Pipe & Supply Co.*, 978 F.2d 1185, 1191 (10th Cir. 1992))). The District Court for the District of Colorado held that because the boilerplate language in the additional terms was the same language that had been included in prior written confirmations that the plaintiff received from the defendant, there was no surprise and the terms were enforceable. *Id.*

### iii. *Application*

The parties agree that Iowa Code section 554.2207 governs whether the Terms and Conditions apply to their contract. At the outset, the court finds that the invoice that CDW sent BVS qualifies as a "written confirmation" under Iowa Code section 554.2207(1). *See* Iowa Code § 554.2207(1); *Sudenga Indus., Inc.*, 894 F. Supp. at 1238 n.3 (noting that courts have consistently found that invoices sent contemporaneously with goods can qualify as written confirmations under U.C.C. section 2-207). In addition, the court finds that it is appropriate to supplement the parties' agreement with course of dealing evidence. *See* Iowa Code § 554.2202(1).

The Terms and Conditions provided on the back of the invoice that CDW sent BVS form "part of the contract unless . . . they materially alter it." Iowa Code § 554.2207(2).

Whether the Terms and Conditions materially alter the contract depends on whether the terms would result in "surprise" to BVS.[6]  Iowa Code § 554.2207, cmt. 4.  Prior to this dispute, BVS and CDW entered into hundreds of transactions.  Furthermore, prior to this dispute, BVS received the Terms and Conditions from CDW hundreds of times.  *See* Harb Affidavit, CDW App'x at 245 (stating that every order confirmation, shipping confirmation and invoice contained a reference to the CDW Terms and Policies or Terms and Conditions, and that BVS received 269 order confirmations, 363 shipping confirmations and 363 invoices from CDW since 2007).  The parties' course of dealing makes it clear that the Terms and Conditions apply to any transaction or agreement that the parties entered into.  *See Avedon Eng'g, Inc.*, 112 F. Supp. 2d at 1094 (stating that prior course of dealing "is important to evaluate" in determining whether additional terms materially alter the contract).  The court finds that, because BVS and CDW have completed hundreds of transactions incorporating the Terms and Conditions, BVS has failed to show that it was surprised by the Terms and Conditions.  *See All-Iowa Contracting Co.*, 296 F. Supp. 2d at 979 (holding that the plaintiff could not show surprise when the plaintiff had received the additional terms from the defendant prior to the agreement); *Avedon Eng'g, Inc.*, 112 F. Supp. 2d at 1094 (holding that additional terms did not materially alter the parties' contract because the parties had exchanged the terms numerous times prior to the transaction at issue and, therefore, there was no surprise); *Sudenga Indus., Inc.*, 894 F. Supp. at 1238 (holding that the terms on the back of an invoice sent after the parties entered into a contract were enforceable because the "invoices were issued relatively contemporaneously with the shipment of goods, . . . the parties'

---

[6] The court notes that BVS acknowledged the invoice and did not dispute the Terms and Conditions.  The purchase price listed in the December 20, 2010 purchase order is $225,000.33, while the purchase price listed in the invoice is $225,000.24 plus $733.67 in shipping, totaling $225,733.91.  BVS paid CDW $225,733.91, the price listed in the invoice, on January 12, 2011.  *See* Check, CDW App'x at 106.  The check referenced the January 3, 2011 invoice.

dealings involved identical invoice provisions throughout the parties' relationship, . . . additional terms [we]re found in the invoices that [we]re not in the purchase orders, and [the plaintiff] never exercised any opportunity to delete these additional terms").

Therefore, the court finds that the January 3, 2011 invoice and the Terms and Conditions printed on the back are part of the contract.

### b.     Are oral promises part of the contract?

#### i.     Parties' arguments

CDW argues that oral promises are not part of the contract because "the plain language of the contract excluded extrinsic and parol terms." CDW Motion at 2. BVS argues that the terms of the contract include oral promises that it alleges CDW's sales representatives made during the course of negotiating the purchase of the SAN solution, including oral promises regarding "the very nature of the goods [and] services sold under the purchase order." Resistance to CDW Motion at 12. Specifically, BVS alleges that CDW breached its oral promise to provide a "complete solution." *Id.* at 13, 22.

#### ii.     Applicable law

Under Iowa law, "when an oral agreement precedes a written agreement on the topic, ordinarily it will be found the oral discussion merged into the written agreement." *Commercial Trust & Sav. Bank of Storm Lake v. Toy Nat'l Bank of Sioux City*, 373 N.W.2d 521, 523 (Iowa Ct. App. 1985); *see also Cemen Tech, Inc. v. Three D. Indus., LLC*, 753 N.W.2d 1, 5-6 (Iowa 2008) (holding that the parties' agreement was superseded by a subsequent agreement that stated that it "comprises the entire agreement and supersedes all prior understandings and representations (oral or written) between the parties"); *Starry v. Starry & Lynch*, 234 N.W. 281, 284 (Iowa 1931) (holding that "[s]tatements made in the course of negotiation were not contracts," and such statements were merged into the final written agreement). The "key question," however, is the intent of the parties. *Commercial Trust & Sav. Bank of Storm Lake*, 373 N.W.2d at 523. "There must be an indication of intent that the second agreement replaces the first." *Id.*;

*see also S. Tex. Land Co. v. Sorensen*, 202 N.W. 552, 553 (Iowa 1925) (finding that the parties intended a subsequent written agreement to be the final expression when the parties acted in compliance with the written terms).

"A fully integrated agreement is found where, based on the totality of the evidence, the writing appears to be the final and complete expression of the agreement." *Horton v. Uptown Partners, LP*, No. 05-0982, 720 N.W.2d 192 (table), 2006 WL 1279044, at *5 (Iowa Ct. App. May 10, 2006) (citing *Montgomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 476 (Iowa 1981)). "Determining whether an agreement is fully integrated is a question of fact, to be determined from the totality of the evidence." *C&J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011). "When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated." *Id.* "The presence of an integration clause is one factor [the court] take[s] into account in determining whether an agreement is fully integrated." *Id.*

Iowa Code section 554.2202 states Iowa's parol evidence rule, which provides that terms to which the parties agree

> or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Iowa Code § 554.2202. The Iowa Supreme Court has held that the parol evidence rule applies where a "contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the . . . agreement." *Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996)

23

(alteration in original) (quoting *Montgomery Props. Corp.*, 305 N.W.2d at 476) (internal quotation mark omitted). Under Iowa law, when a written agreement is fully integrated, "the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement." *Id.* at 290 (citing Restatement Second of Contracts § 213 (1981)); *see also C&J Vantage Leasing Co.*, 795 N.W.2d at 85 ("When an agreement is fully integrated, the parol-evidence rule forbids the use of extrinsic evidence introduced solely to vary, add to, or subtract from the agreement."); *Levien Leasing Co. v. Dickey Co.*, 380 N.W.2d 748, 750 (Iowa Ct. App. 1985) ("A contract with an integration clause typically represents the complete agreement of the parties and any extrinsic evidence which varies, adds, or subtracts from its terms is barred by the parol evidence rule." (citing *Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 433 (Iowa 1984))); *Kroblin*, 347 N.W.2d at 433 ("[T]he parol evidence rule excludes extrinsic evidence which is solely offered for the purpose of varying, adding to, or subtracting from a written agreement.").

### iii.    *Application*

As discussed above, the court finds that the Terms and Conditions are part of the parties' agreement. The Terms and Conditions include an integration clause, which provides:

> THE TERMS AND CONDITIONS ARE LIMITED TO THOSE CONTAINED HEREIN AND THE ADDITIONAL TERMS AND CONDITIONS CONTAINED IN THE "TERMS AND CONDITIONS" LINK AT WWW.CDW.COM INCORPORATED HEREIN BY REFERENCE. ANY TERMS NOT DEFINED HEREIN ARE DEFINED AT WWW.CDW.COM. ANY ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS IN ANY FORM DELIVERED BY YOU ("CUSTOMER") ARE HEREBY DEEMED TO BE MATERIAL ALTERATIONS AND NOTICE OF OBJECTION TO THEM AND REJECTION OF THEM IS HEREBY GIVEN.

BY ACCEPTING DELIVERY OF THE PRODUCTS OR BY ENGAGING THE CDW AFFILIATE IDENTIFIED ON THE INVOICE, STATEMENT OF WORK OR OTHER CDW DOCUMENTATION ("SELLER") TO PROVIDE PRODUCT OR PERFORM OR PROCURE ANY SERVICES, CUSTOMER AGREES TO BE BOUND BY AND ACCEPTS THESE TERMS AND CONDITIONS UNLESS CUSTOMER AND SELLER HAVE SIGNED A SEPARATE AGREEMENT FOR THE PROVISION OF PRODUCT OR PERFORMANCE OF SERVICES, IN WHICH CASE THE SEPARATE AGREEMENT WILL GOVERN.

Terms and Conditions, CDW App'x at 110.

The court finds that the Terms and Conditions are a "complete and exclusive statement of the terms of the agreement" under Iowa Code section 554.2202, and, therefore, the agreement is fully integrated. *See C&J Vantage Leasing Co.*, 795 N.W.2d at 85. The court reaches this conclusion because it finds that: (1) the parties intended the invoice to represent the entire agreement because the Terms and Conditions printed on the back of the invoice include an integration clause; (2) the parties acted in compliance with the invoice when BVS paid CDW the price listed in the invoice rather than the price listed in the purchase order, *see S. Tex. Land Co.*, 202 N.W. at 553 (finding that the parties intended a subsequent written agreement to be a final expression when the parties acted in compliance with the written terms); and (3) the parties are sophisticated and of equal bargaining strength, *see Whalen*, 545 N.W.2d at 291 (applying the parol evidence rule to a contract with an integration clause and noting that the parties "were sophisticated business persons . . . of equal bargaining strength" (quoting *Montgomery Props. Corp.*, 305 N.W.2d at 476)).[7] Therefore, because the contract is a fully integrated agreement, the

---

[7] The court notes that, although it finds that the invoice and accompanying Terms and Conditions contain the exclusive set of the contract's terms, the analysis would be the same even if it were to find that the December 20, 2010 purchase order is also part of the

(continued...)

parol evidence rule applies and evidence of CDW's alleged promise to provide BVS with a "complete solution" is not part of the contract. *See* Iowa Code § 554.2202 (providing that, if "the court finds the writing to have been intended . . . as a complete and exclusive statement of the terms of the agreement," the agreement cannot be supplemented "by evidence of consistent additional terms"); *see also Whalen*, 545 N.W.2d at 291 (noting that, under the parol evidence rule, a party cannot supplement a fully integrated agreement with extrinsic evidence); *Levien Leasing Co.*, 380 N.W.2d at 750 ("A contract with an integration clause typically represents the complete agreement of the parties and any extrinsic evidence which varies, adds, or subtracts from its terms is barred by the parol evidence rule.").

### 2.     *Did CDW breach the contract?*

Having determined the terms of BVS and CDW's contract, the court now turns to consider whether there is a genuine issue of material fact as to whether CDW breached the contract, as BVS alleges in Count I of the Amended Complaint. CDW argues that the court should grant summary judgment in its favor with respect to Count I because "CDW indisputably delivered the goods and services specified in the written contract." CDW Motion at 2. In its Resistance to the CDW Motion, BVS contends that "at least two genuine fact disputes exist on the issue of performance: (1) whether CDW provided the goods [and] services listed in the quotation and purchase order; and (2) whether CDW failed to provide the goods [and] services it promised to provide." Resistance to CDW Motion at 20-21. BVS does not claim that CDW failed to deliver any of the specific items

---

[7](…continued)
contract because the terms of the December 20, 2010 purchase order do not contradict the invoice and Terms and Conditions in any material way. Thus, although the December 20, 2010 purchase order represents the offer, it appears that the invoice absorbs the terms in the December 20, 2010 purchase order.

listed in the invoice.[8]  Rather, BVS claims that CDW breached its oral promise to provide a "complete solution."  Resistance to the CDW Motion at 13, 22.

BVS identifies no specific good or service listed in the invoice that CDW failed to provide or perform.  Rather, BVS's arguments appear to center on CDW's alleged failure to provide a "complete solution" and "to have the SAN operational no later than February 2011."  *Id.* at 21-22.  Neither of those alleged promises are included in the contract. Thus, because BVS does not allege that CDW failed to provide any of the specific goods identified in the contract or that CDW failed to perform any of the specific services identified in the contract, the court finds that there is no genuine issue of material fact as to whether CDW breached the contract.  Accordingly, the court shall grant the CDW Motion to the extent it requests that the court grant summary judgment in CDW's favor on Count I.

### B.  Unjust Enrichment Claim

In Count II of the Amended Complaint, BVS alleges that "CDW will be unjustly enriched unless it is ordered to return the full payment to BVS and otherwise compensate BVS for its losses."  Amended Complaint ¶ 26.  Under Iowa law, "[t]he requirements of proof [for an unjust enrichment claim] are neither technical nor complicated.  '[I]t is essential merely to prove that a defendant has received money which in equity and good conscience belongs to plaintiff.'"  *Iconco v. Jensen Constr. Co.*, 622 F.2d 1291, 1295 (8th Cir. 1980) (third alteration in original) (quoting *In re Estate of Stratman*, 1 N.W.2d 636, 642 (Iowa 1942)).

> To recover on the basis of unjust enrichment, [the plaintiff] must show: (1) it conferred a benefit upon the [defendant] to

---

[8] The court notes that the items listed in the December 20, 2010 purchase order are identical to those listed in the invoice.  The court further notes that BVS makes a general assertion that CDW failed to provide the goods and services listed in the December 20, 2010 purchase order but does not identify anything specific in the December 20, 2010 purchase order that CDW failed to deliver.

its own detriment, (2) the [defendant] had an appreciation of receiving the benefit, (3) the [defendant] accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value, and (4) there is no at-law remedy that can appropriately address the claim.

*Iowa Waste Sys., Inc. v. Buchanan Cnty.*, 617 N.W.2d 23, 30 (Iowa Ct. App. 2000). "Generally the existence of a contract precludes the application of the doctrine of unjust enrichment." *Johnson v. Dodgen*, 451 N.W.2d 168, 175 (Iowa 1990); *see also Cy & Charley's Firestone, Inc. v. Running*, 810 N.W.2d 25 (table), No. 11-0211, 2011 WL 6668039, at *6 (Iowa Ct. App. Dec. 21, 2011) (affirming the lower court's dismissal of the plaintiff's unjust enrichment claim because a purchase agreement governed the parties' dispute). *But see Maasdam v. Estate of Maasdam*, 24 N.W.2d 316, 320 (Iowa 1946) (noting that a party may plead an implied contract claim such as unjust enrichment as an alternative cause of action to an express contract claim).

At the outset, the court notes that the terms of the contract govern the underlying dispute and, therefore, an unjust enrichment claim is not appropriate because any cause of action that BVS has lies as a breach of contract claim. *See Cy & Charley's Firestone, Inc.*, 2011 WL 6668039, at *6. Nonetheless, after considering the merits of this claim, the court finds that the record supports a finding that BVS "conferred a benefit upon" CDW and CDW "had an appreciation of receiving the benefit" because BVS paid CDW the purchase price listed in the invoice. *Iowa Waste Sys., Inc.*, 617 N.W.2d at 30. However, the court finds that the record does not support a finding that CDW "accepted and retained [BVS's payment] under circumstances making it inequitable for there to be no return payment for its value." *Id.* As discussed above, CDW provided all goods and performed all services listed in the invoice. Therefore, the court finds that BVS has failed to create a genuine issue of material fact on its unjust enrichment claim and, therefore, the court shall grant the CDW Motion to the extent it requests that the court grant summary judgment in CDW's favor on Count II.

### C. Breach of Warranty Claims

#### 1.  Parties' arguments

Count III of the Amended Complaint alleges breach of express warranty.  Count IV of the Amended Complaint alleges breach of implied warranty of merchantability.  Count V of the Amended Complaint alleges breach of implied warranty of fitness for a particular purpose.  CDW argues that it cannot be liable under Counts III, IV and V because the Terms and Conditions disclaim all express and implied warranties, CDW did not make any express warranties and the Net App goods and services and the Arrow provisioned services conformed to their respective warranties.

In its Resistance to the CDW Motion, BVS argues that "CDW breached warranties relating to the SAN system, much in the same way it breached the overall contract." Resistance to CDW Motion at 24.  BVS argues that CDW breached its express warranty that "it would deliver, install, implement and configure the SAN [s]olution, including training and knowledge transfer."  *Id.*  BVS also argues that CDW breached the implied warranty of merchantability for the same reasons CDW breached the contract.  Finally, BVS argues that CDW breached the implied warranty of fitness for a particular purpose because CDW had reason to know of the particular purpose for BVS's purchase of the SAN solution and that "BVS was relying on CDW's skill and judgment."  *Id.* at 26.

#### 2.  Application

As discussed above, the court finds that the Terms and Conditions are part of the contract.  With respect to warranties, the Terms and Conditions provide:

> Customer understands that Seller is not the manufacturer of the Products purchased by Customer hereunder and the only warranties offered are those of the manufacturer, not Seller or its Affiliates.  In purchasing the Products, Customer is relying on the manufacturer's specifications only and is not relying on any statements, specifications, photographs or other illustrations representing the Products that may be provided by Seller or its Affiliates.  SELLER AND ITS AFFILIATES

HEREBY EXPRESSLY DISCLAIM ALL WARRANTIES EITHER EXPRESS OR IMPLIED, RELATED TO PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF TITLE, ACCURACY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTY OF NONINFRINGEMENT, OR ANY WARRANTY RELATING TO THIRD PARTY SERVICES. THE DISCLAIMER CONTAINED IN THIS PARAGRAPH DOES NOT AFFECT THE TERMS OF ANY MANUFACTURER'S WARRANTY. Customer expressly waives any claim that it may have against Seller or its Affiliates based on any product liability or infringement or alleged infringement of any patent, copyright, trade secret or other intellectual property rights (each a "Claim") with respect to any Product and also waives any right to indemnification from Seller or its Affiliates against any such Claim made against Customer by a third party. Customer acknowledges that no employee of Seller or its Affiliates is authorized to make any representation or warranty on behalf of Seller or any of its Affiliates that is not in this Agreement.

Seller warrants that the Services will be performed in a good and workmanlike manner. Customer's sole and exclusive remedy and Seller's entire liability with respect to this warranty will be, at the sole option of Seller, to either (a) use its reasonable commercial efforts to reperform or cause to be reperformed any Services not in substantial compliance with this warranty or (b) refund amounts paid by Customer related to the portion of the Services not in substantial compliance; provided, in each case, Customer notifies Seller in writing within five (5) business days after performance of the applicable Services. EXCEPT AS SET FORTH HEREIN OR IN ANY STATEMENT OF WORK THAT EXPRESSLY AMENDS SELLER'S WARRANTY, AND SUBJECT TO APPLICABLE LAW, SELLER MAKES NO OTHER, AND EXPRESSLY DISCLAIMS ALL OTHER, REPRESENTATIONS, WARRANTIES, CONDITIONS OR COVENANTS, EITHER EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS OF

FITNESS FOR A PARTICULAR PURPOSE,
MERCHANTABILITY, DURABILITY, TITLE,
ACCURACY OR NON-INFRINGEMENT) ARISING OUT
OF OR RELATED TO THE PERFORMANCE OR NON-
PERFORMANCE OF THE SERVICES, INCLUDING BUT
NOT LIMITED TO ANY WARRANTY RELATING TO
THIRD PARTY SERVICES, ANY WARRANTY WITH
RESPECT TO THE PERFORMANCE OF ANY
HARDWARE OR SOFTWARE USED IN PERFORMING
SERVICES AND ANY WARRANTY CONCERNING THE
RESULTS TO BE OBTAINED FROM THE SERVICES.
THIS DISCLAIMER AND EXCLUSION SHALL APPLY
EVEN IF THE EXPRESS WARRANTY AND LIMITED
REMEDY SET FORTH HEREIN FAILS OF ITS
ESSENTIAL PURPOSE. CUSTOMER ACKNOWLEDGES
THAT NO REPRESENTATIVE OF SELLER OR OF ITS
AFFILIATES IS AUTHORIZED TO MAKE ANY
REPRESENTATION OR WARRANTY ON BEHALF OF
SELLER OR ANY OF ITS AFFILIATES THAT IS NOT IN
THIS AGREEMENT OR IN A STATEMENT OF WORK
EXPRESSLY AMENDING SELLER'S WARRANTY.

Terms and Conditions, CDW App'x at 110.

The court finds its holding in *All-Iowa Contracting Co.* to be persuasive on this issue. *See All-Iowa Contracting Co.*, 296 F. Supp. 2d at 978-79. In *All-Iowa Contracting Co.*, this court held that the plaintiff's breach of warranty claims were barred because the contract included terms and conditions that the defendant sent after the parties entered into the contract and the terms and conditions barred the breach of warranty claims. *Id.* The court enforced the warranty disclaimer in the terms and conditions and dismissed the plaintiff's breach of warranty claims. *Id.* at 979.

As discussed above, the court finds that the Terms and Conditions are part of the contract between BVS and CDW. The court further finds that the warranties provision of the Terms and Conditions is enforceable. Because CDW disclaimed all warranties in the Terms and Conditions, the court finds that BVS's breach of warranty claims are barred.

31

*See id.* Accordingly, the court shall grant the CDW Motion to the extent it requests that the court grant summary judgment in CDW's favor on Counts III, IV and V.

## D. Fraud and Fraudulent Nondisclosure Claims

### 1. Parties' arguments

Count VI of the Amended Complaint alleges fraud because CDW "knowingly or recklessly" made the following false representations to BVS: (1) that CDW would "timely" furnish the SAN solution; (2) "[t]hat CDW had the skill, expertise and knowledge . . . to furnish, install and configure a fully functional SAN [s]olution"; (3) "[t]hat the SAN [s]olution provided could perform replication in the manner BVS requested"; and (4) "[t]hat CDW would provide a world class solution that met BVS'[s] needs." Amended Complaint ¶ 49. Count VII of the Amended Complaint alleges fraudulent nondisclosure because "CDW knowingly failed to disclose" two material facts: (1) its no-return policy; and (2) its lack of technical aptitude. *Id.* ¶¶ 56, 57.

CDW argues that the court should grant summary judgment in its favor with respect to the fraud and fraudulent nondisclosure claims because "there is insufficient evidence to support any element of fraud based on BVS admissions." CDW Motion at 2. In its Resistance to the CDW Motion, BVS argues that the Amended Complaint sufficiently alleges that CDW made fraudulent representations and fraudulent nondisclosures. Additionally, BVS alleges that summary judgment is not appropriate because genuine issues of material fact exist.

### 2. Applicable law

#### a. Effect of integration clause

As an initial matter, the court notes that, "[a]lthough the [Iowa Supreme Court] ha[s] allowed fraudulent inducement claims to proceed despite an integration clause in a contract, [it] has done so only with regard to misrepresentations concerning facts or circumstances not included in the written contract." *Whalen*, 545 N.W.2d at 294 (refusing to allow the plaintiff to proceed with a fraudulent inducement claim where there was an

integration clause in the contract because the alleged representation involved matters specifically addressed in the contract). However, "[w]hen a 'fine-print, boiler-plate' integration clause 'was not intended to encompass' the fraudulent representations or omissions at issue, then the integration clause does not bar the fraud claims." *McIrvin v. W. Side Unlimited Corp.*, No. 08-CV-127-LRR, 2010 WL 605651, at *10 (N.D. Iowa Feb. 18, 2010) (quoting *Robinson v. Perpetual Servs. Co.*, 412 N.W.2d 562, 567 (Iowa 1987)). Accordingly, if the terms of the contract encompass the alleged misrepresentations, evidence of the alleged misrepresentations is not permissible.

The court will assume, without deciding, that the contract does not fully address any of the misrepresentations that BVS alleges in the Amended Complaint. Although it is arguable that the fraud claims are barred because the alleged representations and omissions involve matters specifically addressed in the invoice, CDW opted to argue that Rule 9(b) and BVS's own admissions foreclose the fraud claims. Rather than address the impact of the integration clause on the fraud claims, the court deems it appropriate to address the fraud claims on Rule 9(b) grounds and on the merits. Therefore, the court will consider extrinsic evidence with respect to BVS's fraud claims.

### *b.    Fraud pleading requirements*

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). That is, the plaintiff must plead "the who, what, when, where, and how." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011). "'[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule.'" *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (alteration in original) (quoting *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002)); *see also Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995) (upholding the district court's decision to grant the defendant's motion for summary judgment on mail and wire fraud claims because the plaintiff "failed to allege the elements

of mail and wire fraud with the required particularity" under Rule 9(b)); *Schultz v. Ability Ins. Co.*, No. C11-1020, 2012 WL 5285777, at *15 (N.D. Iowa Oct. 25, 2012) (granting the defendant's motion for summary judgment on a fraud claim where the allegations in the "complaint [were] vague and conclusory" and failed to meet the heightened pleading standard under Rule 9(b)).

"In order to recover on a fraud action at law in [Iowa], 'a plaintiff must establish . . . the following elements by a preponderance of clear, satisfying and convincing evidence: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage.'" *Ltd. Flying Club, Inc. v. Wood*, 632 F.2d 51, 54 (8th Cir. 1980) (quoting *B&B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 284 (Iowa 1976)). "Scienter and intent to deceive are closely related and 'are shown not only when the speaker has actual knowledge of the falsity of his representation but also when he speaks in reckless disregard of whether his representations are true or false.'" *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149, 155 (Iowa 1984) (quoting *Grefe v. Ross*, 231 N.W.2d 863, 867 (Iowa 1975)); *see also Ltd. Flying Club, Inc.*, 632 F.2d at 55 (stating that a plaintiff can prove scienter "by showing that false representations were made 'in reckless disregard of their truth or falsity'" (quoting *B&B Asphalt Co.*, 242 N.W.2d at 284)). "An honest belief in the truth of one's statements . . . does not preclude a finding of fraud. When a defendant makes a misrepresentation recklessly, with careless disregard for whether it is true or false, he may be liable for fraud." *Beeck v. Kapalis*, 302 N.W.2d 90, 95 (Iowa 1981).

The Iowa Supreme Court has held:

> A mere statement of an honest opinion, as distinguished from an assertion of fact will not amount to fraud, even though such opinion be incorrect. When the statements become representations of fact, or the expression of opinion is insincere and made to deceive or mislead[,] they may be treated as fraudulent. Whether such is their quality and character is ordinarily a jury question.

*Hoefer v. Wis. Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 340 (Iowa 1991) (quoting *Int'l Milling Co. v. Gish*, 137 N.W.2d 625, 631 (Iowa 1965)). "A statement of intent to perform a future act is actionable only when spoken with the existing intention not to perform." *City of McGregor v. Janett*, 546 N.W.2d 616, 619 (Iowa 1996). "Mere failure of future performance cannot alone prove deceit; otherwise every breach of contract would give rise to an action for fraud." *Id.*

### 3. Fraud claim

In Count VI of the Amended Complaint, BVS asserts that CDW made four fraudulent misrepresentations: (1) that CDW would "timely" furnish the SAN solution; (2) "[t]hat CDW had the skill, expertise and knowledge . . . to furnish, install and configure a fully functional SAN [s]olution"; (3) "[t]hat the SAN [s]olution provided could perform replication in the manner BVS requested"; and (4) "[t]hat CDW would provide a world class solution that met BVS'[s] needs." Amended Complaint ¶ 49. The court shall examine each alleged misrepresentation in turn to determine whether it meets the Rule 9(b) standard and, assuming it does, whether a genuine issue of material fact exists.

### a. Timing of installation and implementation

CDW argues that there is insufficient evidence to support BVS's claim that CDW fraudulently misrepresented the time frame in which the SAN solution would be implemented. To support this argument, CDW relies on Praegitzer's deposition. In the deposition, Praegitzer states that he does not "remember [Harb] giving [him] a particular date" in response to counsel's question of whether Harb said that the project would be "installed and running in mid-February or January." Praegitzer Deposition, CDW App'x at 300. In its Resistance to the CDW Motion, BVS does not provide the court with any evidence to show that Harb or any other CDW representative promised that the project would be implemented by a particular date.

The court finds that the Amended Complaint does not identify the "who, what,

when, where, and how," as is required under Rule 9(b), *see Summerhill*, 637 F.3d at 880, and therefore, the allegation does not meet the heightened pleading standard under Rule 9(b). Further, the court finds that BVS has failed to establish a genuine issue of material fact with respect to any of the elements of fraud on this claim and shall grant the CDW Motion to the extent it requests summary judgment in CDW's favor on this portion of Count VI.

### b.     *CDW's technical competency*

CDW argues that BVS fails to specify a person, place or time with respect to its claim that CDW misrepresented its technical competency and, moreover, provides "no evidence that CDW . . . in fact lacked the ability to deliver the products and services." Reply to Resistance to CDW Motion at 4. Additionally, CDW correctly points out that the contract identifies Arrow as the party providing the services and, therefore, BVS should bring allegations regarding technical competency against Arrow. In making its arguments, CDW relies, in part, on Praegitzer's statements at his deposition. At the deposition, counsel asked Praegitzer whether Harb "intended to deceive [BVS] into purchasing [the SAN] by making false statements that [Harb] knew were false." Praegitzer Deposition, CDW App'x at 292. In response, Praegitzer responded, "No, I don't." *Id.* Counsel then asked whether "anyone else from CDW ma[d]e any false statements with the intent to deceive [BVS]," to which Praegitzer responded, "No. I can't say with the intent to deceive [BVS], no." *Id.*

In its Resistance to the CDW Motion, BVS argues that there is a genuine issue of material fact with respect to this claim because CDW, through Harb, "made representations about its qualifications and experience to manage the SAN" solution and "assured BVS that CDW had the requisite technical and project management skill to handle this mission critical project." Resistance to CDW Motion at 28. BVS further claims that these statements are false because "Harb had never sold a NetApp solution before . . . [and] CDW presented Harb and Aljets as technically capable of managing the project, but

they clearly were out of their depth." *Id.*  Finally, BVS argues that the elements of scienter and intent to deceive are present because Harb "possessed reckless disregard for the truth, or falsely stated or implied the representations were based on personal knowledge or investigation." *Id.* at 29.

First, the court finds that BVS's claim fails to comply with the heightened pleading requirement in Rule 9(b) because, in the Amended Complaint, BVS provides nothing more than a bare allegation and does not identify the "who, what, when, where, and how," as is required under Rule 9(b).  *See Summerhill*, 637 F.3d at 880.  Second, even if BVS satisfied the Rule 9(b) pleading requirement, summary judgment is appropriate because the record provides no evidence that CDW did not have the skill to complete its obligations under the contract or that Harb or any other CDW representative made any material misrepresentations about CDW's technical competency with "reckless disregard" as to the statement's truth. *Ltd. Flying Club, Inc.*, 632 F.2d at 55.  Therefore, the court shall grant the CDW Motion to the extent it requests summary judgment in CDW's favor on this portion of Count VI.

### c. Replication

CDW argues that the court should grant summary judgment in its favor with respect to this claim because BVS does not identify who made the representation or when and, thus, the claim is insufficient under Rule 9(b).  In its Resistance to the CDW Motion, BVS provides no additional support for this claim.  The court finds that the allegation contained in the Amended Complaint is not sufficient under Rule 9(b), and, thus, the court shall grant the CDW Motion to the extent it requests summary judgment in CDW's favor on this portion of Count VI.  *See* Fed. R. Civ. P. 9(b); *see Summerhill*, 637 F.3d at 880.

### d. World-class solution

CDW argues that the court should grant summary judgment in its favor with respect to this claim because, in his deposition, Praegitzer stated that Harb did not use the phrase "turnkey solution" to describe the SAN solution and "admitted to his belief that CDW was

not attempting to deceive him." Brief in Support of CDW Motion at 8-9; *see also* Praegitzer Deposition, CDW App'x at 262, 292. In its Resistance to the CDW Motion, BVS argues that Praegitzer's "testimony is not dispositive" and that "turnkey" is not the critical word because this fraud claim rests on CDW's alleged use of the word "solution." Resistance to CDW Motion at 30.

The court finds that the Amended Complaint does not identify the "who, what, when, where, and how," as is required under Rule 9(b), *see Summerhill*, 637 F.3d at 880, and therefore, the allegation does not meet the heightened pleading standard under Rule 9(b). The Amended Complaint alleges that CDW misrepresented that it would provide a "world class solution." However, BVS fails to allege who made this representation and when. Amended Complaint ¶ 49.

Alternatively, summary judgment is appropriate because the fraud claim fails on the merits. In its Resistance to the CDW Motion, BVS provides some clarity and alleges that Harb stated that BVS would provide a "solution." Resistance to CDW Motion at 30. Assuming, arguendo, that BVS is claiming that Harb's alleged statement that CDW would provide a "solution" constitutes a fraudulent misrepresentation, the court finds that this allegation is not sufficient to support a fraud claim. Praegitzer stated in his deposition that he could not recall whether Harb referred to the SAN as a "total solution" and that he did not believe that Harb or anyone else at CDW made false statements with the intent to deceive. Praegitzer Deposition, CDW App'x at 262, 292. Thus, although BVS alleges that Harb made the misstatement, BVS does not provide any evidence in support of the bare allegation in the Amended Complaint. Further, even if Harb did promise that BVS would provide a "solution," such a statement only supports a fraud claim if Harb made it "with the existing intention" not to provide a "solution." *City of McGregor*, 546 N.W.2d at 619 ("Mere failure of future performance cannot alone prove deceit . . . ."). BVS does not provide any evidence to support a finding that Harb promised a "solution" with the existing intention not to provide one.

38

Based on the foregoing, the court finds that BVS has failed to allege a genuine issue of material fact with respect to this claim. Therefore, the court shall grant the CDW Motion to the extent it requests summary judgment in CDW's favor on this portion of Count VI.

### 4. Fraudulent nondisclosure claim

#### a. Applicable law

Under Iowa law, a representation need not be an affirmative misstatement to constitute fraud. "[T]he concealment of or failure to disclose a material fact can constitute fraud." *Clark v. McDaniel*, 546 N.W.2d 590, 592 (Iowa 1996). "For concealment to be actionable, the representation must relate to a material matter known to the party . . . which it is his legal duty to communicate to the other contracting party . . . ." *Id.* (alteration in original) (quoting *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987)). Fraudulent nondisclosure may occur "when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact involved in the transaction." *Kunkle Water & Electric, Inc. v. City of Prescott*, 347 N.W.2d 648, 653 (Iowa 1984). "The threshold question in [a fraudulent nondisclosure] case is whether the defendant owes the plaintiff a duty of care." *Lee Cnty. Mental Health Ctr., Inc. v. Lee Cnty. Bd. of Supervisors*, No. 99-0864, 2000 WL 1288873, at *5 (Iowa Ct. App. Sept. 13, 2000). "Whether such a duty exists is always a question of law for the court." *Id.*

A plaintiff alleging fraudulent nondisclosure must plead and prove the following: "(1) [t]he defendant . . . concealed material facts; (2) the plaintiff lacks knowledge of the true facts; (3) the defendant intended the plaintiff to act upon such representations; and (4) the plaintiff did in fact rely upon such representations to his prejudice." *Estate of Anderson v. Iowa Dermatology Clinic, PLC*, 819 N.W.2d 408, 415 (Iowa 2012) (quoting *Christy v. Miulli*, 692 N.W.2d 694, 702 (Iowa 2005)). A plaintiff alleging fraudulent concealment "must prove the defendant did some affirmative act to conceal the plaintiff's

cause of action independent of and subsequent to the liability-producing conduct." *Christy*, 692 N.W.2d at 702.

### b.    Application

In Count VII, BVS alleges that CDW concealed two material facts: (1) its no-return policy; and (2) its lack of technical aptitude. The court shall examine each claim in turn to determine whether it satisfies the heightened Rule 9(b) standard, and, assuming it does, whether a genuine issue of material fact exists.

### i.    No-return policy

In the Amended Complaint, BVS alleges that CDW's failure to disclose that "some or all of the component parts for the SAN [s]olution were subject to a no-return policy" gives rise to a fraudulent nondisclosure claim. Amended Complaint ¶ 56. CDW argues that the court should grant summary judgment in its favor with respect to this claim because it had no duty to disclose the information and there is no evidence that CDW acted recklessly or with the intent to deceive. In addition, CDW claims that such information is not material and that CDW could not have acted with reckless disregard with respect to this information because the parties did not discuss CDW's return policy in negotiations.

First, the court finds that the Amended Complaint does not identify the "who, what, when, where, and how," as is required under Rule 9(b), *see Summerhill*, 637 F.3d at 880, and, therefore, the allegation does not meet the heightened pleading standard under Rule 9(b).

Alternatively, the court finds that BVS has failed to show that CDW "did some affirmative act to conceal" its no-return policy. *Christy*, 692 N.W.2d at 702. BVS has also failed to show that CDW "purposely suppress[ed] the truth" and that the no-return policy was a "material fact involved in the transaction." *Kunkle Water & Electric, Inc.*, 347 N.W.2d at 653. Therefore, because BVS has failed to demonstrate a genuine issue of material fact with respect to this claim, the court shall grant the CDW Motion to the extent it requests summary judgment in CDW's favor on this portion of Count VII.

### ii. Lack of technical aptitude

In the Amended Complaint, BVS also alleges that CDW's failure to disclose that "the primary employees it assigned to sell the SAN [s]olution and coordinate the installation and implementation lacked technical aptitude" amounts to a fraudulent nondisclosure. Amended Complaint ¶ 57. CDW argues that the court should grant summary judgment in its favor with respect to this claim because BVS had equal information and had no right to rely "on the representations or nondisclosures of a nontechnical sales representative and project coordinator." Brief in Support of CDW Motion at 16.

The court finds that the Amended Complaint does not identify the "who, what, when, where, and how," as is required under Rule 9(b), *see Summerhill*, 637 F.3d at 880, and, therefore, the allegation does not meet the heightened pleading standard under Rule 9(b). Therefore, because BVS has failed to demonstrate a genuine issue of material fact with respect to this claim, the court shall grant the CDW Motion to the extent it requests summary judgment in CDW's favor on this portion of Count VII.

## VII. REMAINING MOTIONS FOR SUMMARY JUDGMENT

In CDW's Third-Party Complaint against Arrow, Net App and TSSLink, CDW "seeks contribution and indemnity from and against [Arrow, Net App and TSSLink] for costs and any judgment that may be entered against CDW arising from the BVS Complaint." Third-Party Complaint ¶ 8. Each claim in the Third-Party Complaint seeks damages in the event that the court holds CDW liable to BVS. Because the court grants summary judgment in favor of CDW on each claim in the Amended Complaint, the court finds that it need not address the Arrow Motion, the Net App Motion and the TSSLink Motion. The Arrow Motion, the Net App Motion and the TSSLink Motion shall be denied as moot.

## VIII.  CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED THAT**:

(1)  Defendant CDW Direct, LLC's Motion for Summary Judgment (docket no. 70) is **GRANTED**;

(2)  Third-Party Defendant Arrow Electronics, Inc.'s Motion for Summary Judgment (docket no. 66) is **DENIED AS MOOT**;

(3)  Third-Party Defendant Net App, Inc.'s Motion for Summary Judgment (docket no. 67) is **DENIED AS MOOT**;

(4)  Third-Party Defendant TSSLink, Inc.'s Motion for Summary Judgment (docket no. 68) is **DENIED AS MOOT**;

(5)  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant CDW, Inc. and against BVS, Inc.

**DATED** this 28th day of March, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA